IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARGARET MIKE, WILLIAM MIKE,
SHANNON MIKE and GEORGETTE
MIKE, individually,

and

SHANNON MIKE and GEORGETTE
MIKE as parents and next friends of
AE.M., AU.M.
and AA.M., minor children,

       Plaintiffs,

vs.                                    No. 1:12-cv-01215 KG/SMV

TERRY McCOY, STEVE JACKSON,
DAVE McCALL, MANASSEH BEGAY and
KORY FAULK, individually, and as
Law Enforcement Officers and Employees of
SAN JUAN COUNTY SHERIFF'S DEPARTMENT,
and JORGE ADRIAN ORTEGA-GALLEGOS,
DEPUTIES AND EMPLOYEES OF SAN
JUAN COUNTY SHERIFF'S DEPARTMENT
WHOSE IDENTITIES ARE UNKNOWN AT THIS TIME,

and

WALTER NICKERSON and DAVID KING,
individually, and as Law Enforcement Officers
and Employees of CITY OF FARMINGTON
POLICE DEPARTMENT, and OFFICERS
AND EMPLOYEES OF FARMINGTON POLICE
DEPARTMENT WHOSE IDENTITIES ARE
UNKNOWN AT THIS TIME,

       Defendants.

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants'[1] Motions for Summary Judgment Based on Qualified Immunity and on Plaintiffs' Inability to Support Claims (Docs. 29, 38).  The first motion was filed on June 19, 2013, by Terry McCoy, Steven Jackson, Dave McCall, Manasseh Begay, all officers for the San Juan County Sheriff's Department ("SJCSD") at all times material to this case ("County Defendants").  (Docs. 29-30).  The second motion was filed on July 16, 2013, by Walter Nickerson and David King, police officers for the Farmington Police Department ("FPD") at all times material to this case ("City Defendants").  (Docs. 38, 41).  Plaintiffs, the Mike family ("the Mikes"), responded[2] to County Defendants' Motion for Summary Judgment on October 10, 2013, (Doc. 53), and County Defendants replied on November 4, 2013 (Doc. 61).  The Mikes responded to City Defendants' Motion for Summary Judgment on October 15, 2013, (Doc. 55), and City Defendants' replied on November 4, 2013 (Doc. 62).

The Mikes' claims against Defendants include 42 U.S.C. § 1983 claims for unlawful search and seizure, false arrest or detention, and excessive force, as well as state claims for false arrest or detention, excessive force, unlawful search, and assault and battery.[3]  Based on a review

---

[1] Defendants Kory Faulk and Jorge Adrian Ortega-Gallegos have not had counsel enter the case or filed any pro se pleadings.  The Court's discussion of "Defendants" excludes Faulk and Ortega-Gallegos.

[2] The Mikes originally responded to both Motions for Summary Judgment by way of Federal Rule of Civil Procedure 56(d) motions for additional discovery.  (Docs. 37, 47).  The Court denied the Mikes' requests for additional discovery on September 23, 2013.  (Doc. 50).  The Court extended the deadlines for the Mikes to respond to the merits of the Motions for Summary Judgment to October 10, 2013, (*id.*), for the County Defendants' motion and to October 15, 2013, for the City Defendants' motion (*id.*; Doc. 52).

[3] The Complaint fails to state which claims are brought under federal law and which claims are brought under state law.  However, the Mikes' response to the County Defendants' Motion for Summary Judgment sheds light on this matter.  (Doc. 53).  The response first discusses unlawful search and seizure, excessive force, and false arrest or detention in terms of federal law.  (*Id.*) at

of the briefing, the record, and applicable law, the Court will grant in part the Motions for Summary Judgment.

A. *Factual & Procedural Background*

The Court construes the factual record and reasonable inferences therefrom in the light most favorable to the Mikes. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). City Defendants adopt all material facts outlined by County Defendants in their Motion for Summary Judgment and provide additional material facts pertinent to them, all of which are discussed herein.

During the early morning hours on March 19, 2012, a series of crimes occurred in San Juan County, New Mexico. At approximately 4:30 a.m., officers from the SJCSD were dispatched to a Circle S store in Farmington for a robbery in progress. Prior to the officers' arrival, the suspect fled in a stolen vehicle from Colorado described as a white truck with a rack on top. Deputy Samuel Cordova located the truck traveling in the wrong lane of traffic. Deputy Cordova tried to stop the vehicle by activating his lights and sirens. However, the truck sped away, reaching speeds of over ninety miles per hour and going westbound in eastbound lanes through residential neighborhoods. Deputy Cordova, as well as Deputy Begay, pursued the stolen truck. The vehicle chase came to a halt when the suspect crashed into a gas meter. The suspect fled on foot.

Deputies set up a perimeter around the crash area and called for the SJCSD's helicopter. As officers searched for the suspect, they received a report of another stolen vehicle in the area, this time near the Anadarko Petroleum Plant. Because of the proximity of the Petroleum Plant to the truck crash, officers believed that the same suspect was involved in both incidents.

---

12-23. The response then discusses excessive force, false arrest, unlawful search, and assault and battery as state claims. (*Id.*) at 23.

The suspect drove the second stolen vehicle through a fence at the Petroleum Plant yard. The SJCSD helicopter located the vehicle on the Riverview Golf Course.  The suspect had crashed the vehicle into a small hill and abandoned the vehicle.  Officers continued searching for the suspect.

At approximately 6:30 a.m., a burglary was reported at the Navajo Food Distribution Center, located about one mile from the Riverview Golf Course.  At about 8:03 a.m., Deputy McCoy and Deputy Begay heard Sergeant Jackson's radio report that a vehicle had fled from him.[4]  Sergeant Jackson lost the vehicle due to the suspect's excessive speed and aggressive driving.  According to Deputy McCoy and Deputy Begay, Sergeant Jackson reported the vehicle that fled from him was a "dark colored 'Malibu-like vehicle.'"  (Doc. 30) Ex. 2 at 3; (Doc. 30) Ex. 3 at 3.  Sergeant Jackson reported a "dark color Impala" fleeing from him.  (Doc. 30) Ex. 1 at 2.

At approximately 8:23 a.m., the Central Consolidated Schools Administration, located near where Sergeant Jackson saw the dark-colored vehicle, reported that a vehicle with several laptops inside was stolen from its yard and driven through a chain-link fence.  The person who reported the incident thought that he might have seen the suspect drive off from the yard at approximately 8:00 a.m.  At 9:02 a.m., the County dispatch described the third stolen vehicle as a "dark brown almost black Impala NM 28 G74145 heavy damage to front end/ran under a chain link fence."  (Doc. 53) Ex. 1 at 1.  An 8:07 a.m. dispatch described a vehicle that was cobalt blue and at 8:48 a.m. a dispatch describes a blue Chevy Malibu.[5]  (Doc. 61) Ex. 1 at 1-2.

---

[4] It is unclear whether the suspect was driving this vehicle.

[5] These dispatch records are referenced for the first and only time in County Defendants' reply to their Motion for Summary Judgment.  (Doc. 61) at 3.  "Attaching new exhibits to a reply brief is a 'troubling' practice."  *Lee v. Colvin*, No. 12-2259-SAC, 2013 WL 4549211, at *6 (D. Kan. Aug. 28, 2013) (unpublished) (citing *United States v. Soussi*, 316 F.3d 1095, 1108 n.9 (10th Cir.

At approximately 9:15 a.m., Deputy McCoy, was on duty in plain clothes and driving an unmarked car when he observed a dark blue Chevrolet Malibu sedan in front of him with no visible license plate.[6]  The sedan had darkly tinted windows, and it was snowing at the time. William Mike was driving this sedan, his wife Margaret Mike was a front seat passenger, and their three minor grandchildren all were in the back seat.  All the occupants are Native American.

While the Mikes were trying to parallel park, Deputy McCoy pulled up behind the sedan, stepped out of his vehicle, and displayed his duty weapon.  William Mike interpreted the incident as armed "road rage" perhaps over the parking spot or some other armed civilian threat.  The Mikes did not see any emergency lights flashing on Deputy McCoy's vehicle, nor did Deputy McCoy identify himself as a law enforcement officer.[7]  William Mike began to drive away from the area.  Deputy McCoy returned to his vehicle, requested assistance, and continued to pursue the sedan.  William Mike made a right turn and soon pulled over to the right side of the road when he saw police vehicles flashing emergency lights.  Officers Nickerson, King, and Begay parked their patrol cars at the scene.

---

2002)).  However, County Defendants previously raised the issue of the vehicle's description in their Motion for Summary Judgment, so additional descriptions should come as no surprise to the Mikes.  *See id.*

[6] The Mike vehicle had a temporary license plate in the front dash.

[7] The parties dispute how the Mikes were stopped.  Defendants state that Deputy McCoy activated his emergency lights, and the driver pulled over.  According to Defendants, once Deputy McCoy exited his vehicle, the driver drove away.  Defendants contend that Deputy McCoy followed the sedan, and the driver pulled over once again.  As before, the driver pulled away when Deputy McCoy exited his vehicle.  Defendants state that it was not until the third time the sedan pulled over that it remained, with the assistance of marked police vehicles. Construing the facts in the light most favorable to the Mikes, the Court accepts that the Mikes only pulled over and pulled away one time and that Deputy McCoy did not engage any emergency lights.

Deputy Begay then took cover behind the open driver's door of Deputy McCoy's unit, and Deputy McCoy took a position behind the front passenger side door of his vehicle. Deputy McCoy unholstered his gun and pointed it down in the ready position. Deputy Begay also unholstered his gun. Deputy Begay pointed his gun in the direction of the sedan. Officers Nickerson and King took cover behind their driver doors and drew their duty weapons. Officer King gave commands over a bull horn to the occupants of the sedan to exit the vehicle, starting with the driver and working back to the back seat occupants.

As William Mike exited the sedan, Officer Nickerson provided cover for the other officers. Officer Begay ordered William Mike to put his hands up and back slowly toward Deputy McCoy's vehicle. As William Mike walked backwards, Deputy Begay holstered his weapon. When William Mike approached Deputy McCoy's vehicle, he was ordered to get on his knees. William Mike complied, and Deputy Begay handcuffed William Mike and escorted him to Deputy Begay's vehicle.

Meanwhile, Deputy McCoy ordered the front passenger—Margaret Mike—to exit the sedan. The officers did not handcuff Margaret Mike.[8] She was placed in the back of Deputy McCoy's vehicle. Deputy Begay returned to the space behind the driver's door of Deputy McCoy's vehicle. One of the grandchildren exited the sedan and was ordered to put her hands above her head and back up slowly towards Deputy McCoy's vehicle. Deputy Begay handcuffed the thirteen-year-old child, Au.M., and placed her in Officer King's patrol vehicle. The other two grandchildren, ages fifteen and eleven, exited the sedan. Neither was handcuffed,

---

[8] The Mikes do not dispute that Margaret Mike was not handcuffed, even though later parts of their briefing suggest that she was handcuffed. (Doc. 30) ¶ 18; (Doc. 41) at 2; (Doc. 53) ¶ 18. Also, the video evidence does not show Margaret Mike. The Court adopts the version of the facts that Margaret Mike was not handcuffed based on these grounds.

and they were escorted to police vehicles.[9]  Next, Officers King, McCoy, and Nickerson looked inside the front and back seats of the sedan, and Officer King ran the sedan's VIN to check if it was stolen.  (Doc. 31 Begay Video Exhibit 5).  One officer walked around the back of the vehicle and disappeared from the view of the camera for approximately six seconds.  (*Id.*)

Sergeant Jackson arrived at the scene, although it is not clear from the record at what time Sergeant Jackson arrived.  At 9:28:10 a.m.,[10] an officer is heard stating of the Mike family, "That ain't them."  (*Id.*)

At 9:28:45 a.m., one of the officers moved the thirteen-year-old granddaughter into the car with the eleven-year-old granddaughter.  (*Id.*)  At 9:30:25 a.m., one of the officers began to help William Mike out of a police unit and then removed Mike's handcuffs.  (*Id.*)  Sergeant Jackson began to explain at 9:30:53 a.m. why the sedan had been pulled over.  (*Id.*)  Another officer opened the door to the patrol unit containing the thirteen and eleven-year-old grandchildren at 9:30:55 a.m., and the children exited the vehicle at 9:31:34 a.m.  (*Id.*)

At approximately 10:00 a.m. on the same date David Zepeda was arrested following another high speed police chase on suspicion of carrying out the crime spree.

*B. Standard of Review*

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[11]  When

---

[9] County Defendants note that there may be a dispute as to whether all three grandchildren exited the sedan and as to whether they were all placed in police vehicles.  However, the parties do not dispute that for purposes of the Motions for Summary Judgment, the facts as outlined here may be accepted as true.

[10] The time stamps on this video appeared to be an hour behind.  The Court has adjusted the times accordingly.

[11] Rule 56 was amended effective December 1, 2010, but the standard for granting summary judgment remains unchanged.

applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics*, 912 F.2d at 1241.  The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted).

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014).  Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity. *Id*.  At the summary judgment stage, the Court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.* The Court may in its discretion decide which of the two-parts of the qualified immunity test to address first. *Id.* at 412.

"In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).  The plaintiff, however, "is not required to show that the very conduct in question has previously been held unlawful." *Sh. A. ex rel. J. A. v. Tucumcari Mun. Schools*, 321

F.3d 1285, 1287 (10th Cir. 2003). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for prior cases with precisely the same facts." *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004). Once the Court concludes that a right was "clearly established," then it becomes the "defendant's burden to prove that her conduct was nonetheless objectively reasonable." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citation omitted). "[T]he court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Whether a defendant's conduct is objectively reasonable is a legal question, but a factual question may arise when there is a dispute regarding the historical facts material to the objectively reasonable issue. *Roska*, 328 F.3d at 1251.

Furthermore, the Tenth Circuit Court of Appeals instructs that

[i]f the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity. If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that "no genuine issues of material fact" exist and that the defendant "is entitled to judgment as a matter of law." In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be "properly denied."

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citations omitted).

*C. Discussion*

   *1. Standing of Shannon Mike and Georgette Mike*

      Prior to addressing the arguments in the briefing, the Court notes that Shannon Mike and

Georgette Mike, parents of the three minors who were in the Mike's sedan, are among the Plaintiffs, bringing suit both individually and as parents and next friends of their children.  (*See* Doc. 1).  Notably, Shannon and Georgette Mike were not occupants of the sedan.  While Shannon and Georgette Mike have standing to sue as parents and next friends of their children, "they do not have standing *individually* because they failed to assert an injurious deprivation of their own legal rights or interests."  *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 606 (5th Cir. 2004) (emphasis in original); *cf. Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 544-45 (6th Cir. 2014) (finding individual standing for parents who experienced financial damages due to alleged discrimination against their children).  Because Shannon and Georgette Mike have failed to assert any deprivations of their own legal rights, the Court dismisses with prejudice the claims they bring in their individual capacities.

### 2. Race and Age Discrimination

The Mikes allege in their Complaint that Deputy McCoy "has a history of violations of the rights of Native Americans and the elderly and his unlawful and oppressive actions were motivated by racial discrimination, racial animus and racial profiling of the Plaintiffs, and were done with the expectation that he could harass and oppress the Plaintiffs with impunity."  (Doc. 1) at 10.  The Mikes also allege that Sergeant Jackson knew that Deputy McCoy was harassing and oppressing the Mikes because of their race and age, yet he failed to stop Deputy McCoy's actions.  (*Id.*) at 11.  Despite these allegations, the Mikes have failed to make a claim for relief on that basis.  Nor have the Mikes moved for leave to amend their Complaint to add discrimination claims for relief.  Therefore, the Court will not address any race and age discrimination claims.

### 3. Section 1983 Claims

*a. The Initial Stop (Unlawful Seizure)*

County Defendants argue that Deputy McCoy did not violate the Fourth Amendment to be free from unlawful seizure because he had reasonable suspicion to stop the Mike vehicle. County Defendants cite *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000), for the proposition that the totality of the circumstances made the stop justified. They point out that officers had been responding to a dangerous crime spree for several hours prior to the stop. Further, the Mike vehicle did not have a license plate on the back, and County Defendants contend that Deputy McCoy could not see a temporary license in the front dash through the darkly tinted windows. County Defendants argue that stolen vehicles often have their license plates removed. They also maintain that the darkly tinted windows and snowy weather made it impossible to see if there were passengers in the Mike vehicle, and even after the officers approached the vehicle, the officers could not tell whether the suspect was inside or whether the Mikes were being held hostage. The fact that William Mike pulled over but then resumed driving further raised Deputy McCoy's suspicions. County Defendants also argue that the fact that the Mike vehicle was a Malibu rather than an Impala, dark blue instead of dark brown/almost black, and contained five occupants rather than a single suspect does not make the stop unreasonable. They further contend that courts have recognized the constitutionality of Deputy McCoy's actions, and he is therefore entitled to qualified immunity.

City Defendants similarly argue that they are entitled to qualified immunity because they reasonably believed from dispatch that the Mike vehicle generally matched the description of the vehicle from the crime spree. The Mikes acknowledge that "Deputy McCoy was primarily at fault in this matter for stopping the Mike family car without performing an inspection of the automobile and its occupants prior to calling in a felony stop." (Doc. 55) at 9. They argue,

however, that City Defendants should have realized shortly after the encounter that the Mike car did not match the description of the stolen vehicle.

The Mikes counter that Deputy McCoy lacked reasonable suspicion to stop the Mikes. They state that instead of a dark brown or black 2008[12] Chevrolet Impala with government license plates, an agency fleet number on the front driver's side fender,[13] heavy front-end damage, and a lone driver, the Mike vehicle by contrast was a new, 2012 Chevrolet Malibu with no government markings or body damage and contained a family of five.  The Mikes assert that Deputy McCoy is not entitled to qualified immunity because it was unreasonable for him to believe there was reasonable suspicion to pull over the Mike vehicle.  Further, they argue that Deputy McCoy failed to make a reasonable investigation into the circumstances before making an investigative stop.  (Doc. 53) at 13-14 (citing shoplifting cases *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), *reaff'd*, 796 F.2d 1307 (10th Cir. 1986)).  The Mikes posit that Defendants "closed their eyes and ignored the facts in front of them" in stopping and detaining the family.  (*Id.*) at 14.  Finally, the Mikes argue that Deputy McCoy violated NMSA 1978, § 66-8-124(A) (Cum. Supp. 2013), by attempting to stop the Mike vehicle without clearly identifying himself as a police officer.

County Defendants reply that the Mikes rely primarily on one dispatch describing the suspect vehicle as a dark brown or black Chevy Impala with government plates and heavy front-

---

[12] The dispatch records provided by the Mikes do not state what year the suspect vehicle was, so the Court will not consider this factual statement.

[13] The dispatch records provided do not state that the vehicle had an agency fleet number affixed to it or where the number appeared, so the Court will not consider this factual statement.

end damage[14] while ignoring the other activity arising from the crime spree.  They also

distinguish cases cited by the Mikes regarding a failure to make a reasonable investigation into

the circumstances by pointing out that, unlike in this case, the shoplifting cases involved video

evidence that police could have checked before detaining the alleged shoplifters.  Further,

County Defendants contend that the Mikes are attempting to hold the officers to a standard for

the stop that is higher than that of reasonable suspicion.

"As a general matter, police can stop and briefly detain a person for investigative

purposes if the officer has a reasonable suspicion supported by articulable facts that criminal

activity may be afoot, even if the officer lacks probable cause."  *United States v. Neff*, 681 F.3d

1134, 1137-38 (10th Cir. 2012) (quotation omitted).  The investigative stop is called a *Terry*

stop, recognized in *Terry v. Ohio*, 392 U.S. 1 (1968).  To determine whether a *Terry* stop was

supported by reasonable suspicion, a court "must consider the totality of the circumstances of

each case to see whether the detaining officer has a particularized and objective basis for

suspected legal wrongdoing."  *Neff,* 681 F.3d at 1138.

"An officer's objectively reasonable mistake of fact may support the reasonable suspicion

or probable cause necessary to justify a traffic stop."  *United States v. Winder*, 557 F.3d 1129,

1134 (10th Cir. 2009) (citations omitted).  "That an officer's suspicions may prove unfounded

does not vitiate the lawfulness of a stop, provided the officer's error was made in good faith and

is objectively reasonable under the circumstances."  *Id.* (citation omitted).  "Police errors, in this

context, are simply unavoidable, as reasonable suspicion involves 'probabilities' rather than

'hard certainties.'"  *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).  "In the

---

[14] Defendants suggest that Deputy McCoy may or may not have heard this single radio
transmission.  However, Deputy McCoy's affidavit states that he heard the transmission about "a
dark colored Chevrolet sedan, dark brown or black."  (Doc. 30) Ex. 3 at 3.

context of a § 1983 action . . . , the officer 'is entitled to qualified immunity if a reasonable

officer could have believed that reasonable suspicion existed to detain the plaintiff'—i.e., if the

officer had 'arguable reasonable suspicion.'" *Vondrak v. City of Las Cruces*, 535 F.3d 1198,

1207 (10th Cir. 2008) (quoting *Cortez*, 478 F.3d at 1120, 1123).

The Tenth Circuit recently found no objectively reasonable basis for seizing a family of

five through a felony stop where a new officer randomly and incorrectly ran the family's license

plate number, pulling up an NCIC report for a stolen maroon 2009 four-door Chevrolet sedan

with expired plates. *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1304, 1312 (10th Cir. 2015).

The officer failed to compare this NCIC result with the family's vehicle, a red 2004 Ford F-150

pickup truck with current plates. *Id.* The Court found that the officer was not entitled to

qualified immunity because "it was clearly established, at the time of this arrest, that an officer

must have probable cause to arrest an individual, and the officer must reasonably investigate

readily available exculpatory evidence before invoking the power of warrantless arrest and

detention." *Id.* at 1312. The court determined that the family was arrested without probable

cause and that the officer failed to compare the vehicle on the screen to the family's vehicle or

verify with dispatch that the vehicle was stolen. *Id.* at 1310-12.

The facts surrounding *Hurst*, a Sixth Circuit case, are more similar to those in the instant

case. In *Hurst*, police were searching for burglary suspects reported to be driving a dark-colored

Thunderbird missing a front grill and containing two occupants. 228 F.3d at 755-56. Unlike in

*Maresca*, police pulled over a similar looking dark blue Mercury Cougar with three occupants

and a missing front grill in a location consistent with the time elapsed since the burglary and the

suspected escape direction. *Id.* at 755-57. The Sixth Circuit affirmed a denial of a motion to

suppress evidence derived from this stop, finding that there were "specific and articulable facts,

14

which, taken together with reasonable inferences, certainly gave rise to reasonable suspicion of criminal activity." *Id.* at 757.

Based on the undisputed material facts and video evidence submitted by the parties, the Court finds that a reasonable officer could have believed that the Mike vehicle contained the suspect. This case is more similar to *Hurst* than to *Maresca* in that the make, model, and color of the vehicles were at similar. The video evidence shows a dark sedan with darkly-tinted windows. It was snowing at the time, and the Court cannot ascertain from the videos the exact color of the Mike vehicle, aside from it being dark in color. The parties do not dispute that the Mike vehicle had no license plate affixed to the back of the vehicle. Deputy McCoy followed the Mike vehicle and, therefore, could not see the front of the vehicle. Likewise, none of the officers parked ahead of the Mike vehicle for the stop, where they might have been able to view the front of the vehicle from the outset of the stop. Finally, based on William Mike's action of stopping and then pulling away, and the totality of the circumstances, a reasonable officer could believe that the Mike vehicle could be the suspect vehicle.

The Mikes' rely on *Baptiste* and *Lusby* for the proposition that Deputy McCoy failed to properly investigate before stopping the Mike family. These cases are inapposite. In *Lusby*, the court affirmed the denial of qualified immunity to an officer for an arrest where he "act[ed] unreasonably when he investigated the alleged shoplifting" by "not check[ing] with the clerk operating the checkout line to see if [plaintiff] paid for the sunglasses." 749 F.2d at 1432. In *Baptiste*, the court found no probable cause for city police officers to arrest the plaintiff shopper based on security guards' allegations of theft when the officers viewed video evidence not suggesting theft and corroborating the plaintiff's story. 147 F.3d at 1256-57. The court affirmed the denial of qualified immunity for the officers. *Id.* at 1259. The court explained that "[w]hile

15

officers may weigh the credibility of witnesses in making a probable cause determination, they may not ignore *available* and *undisputed* facts." *Id.* (emphasis in original).

In the present case, the officers did not ignore available and undisputed facts when they made the stop. The stop occurred contemporaneously with Deputy McCoy's observations. The Mike vehicle and suspect vehicle were sufficiently similar that the officers reasonably believed that the Mike vehicle could be the suspect vehicle and that further investigation was necessary. Defendants did not fail to properly investigate before making the stop.

Finally, the Mikes' assertion that Deputy McCoy violated NMSA 1978, § 66-8-124(A) (Cum. Supp. 2013), when effecting the stop is without merit. This statute provides that "[n]o person shall be arrested for violating the Motor Vehicle Code or other law relating to motor vehicles punishable as a misdemeanor except by a commissioned, salaried peace officer who, at the time of arrest, is wearing a uniform clearly indicating the peace officer's official status." *Id.* Defendants did not stop the Mikes for a misdemeanor motor vehicle violation. Instead, the vehicle was stopped because it was suspected of being involved in a felony crime spree. The statute is inapplicable to this case.

In sum, a reasonable jury could not find that Defendants violated the Mikes' Fourth Amendment rights with respect to the initial stop.[15] Based on the forgoing, the Court grants qualified immunity to Defendants on the unlawful seizure claims based on the initial stop.

   *b. Length of Detention (Unlawful Seizure/False Arrest)*

The Mikes also bring a Fourth Amendment claim based on unlawful length of detention. The Mikes allege in the Complaint that "[d]espite the fact that the Defendants . . . had

---

[15] The Court does not address the Mikes' false arrest claims to the extent they may deal with the initial stop since the Court found that the stop did not constitute an unlawful seizure. Whether the seizure later became unlawful and resulted in a false arrest will be discussed in the next section.

determined that the Mike automobile was not the stolen vehicle that they were looking for and that the Plaintiffs were not suspects in any crime, the seizure and detention of the Plaintiffs continued . . . ." (Doc. 1) at 10. In their Motion for Summary Judgment, County Defendants argue that the detention in this case lasted only ten minutes, the Mike family was not taken to another location, and the family was promptly released. County Defendants cite to two cases they contend support a finding that a stop of the duration in the present case is constitutionally permissible. (Doc. 30) at 12 (citing *Flowers v. Fiore*, 359 F.3d 24 (1st Cir. 2004); *Williams v. Edwards*, No. 10 C 1051, 2012 WL 983788 (N.D. Ill. Mar. 22, 2012)). They assert that because case law authorizes the Defendants' actions, they are entitled to qualified immunity.

City Defendants note that a stop must cease once officers' suspicions are dispelled, and they argue that the stop ceased accordingly in the present case. They maintain "reasonable suspicion evaporated after all the Plaintiffs exited the car and, at that time, the Plaintiffs were sent on their way in less than 15 minutes." (Doc. 41) at 7-8. City Defendants contend that the duration of the stop was reasonable and they are entitled to qualified immunity as to the seizure. They also argue that the Mikes "cannot impute information held by one officer or actions taken by one officer to all the others on the scene." (Doc. 62) at 7.

The Mikes argue that a detention must last no longer than is necessary to effectuate the purpose of the stop and the methods employed must be the least intrusive available. (Doc. 53) at 21 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). They contend the officers could immediately see the Mike vehicle was not the suspect vehicle, but even if the initial stop was reasonable, the officers should have quickly seen from the lack of damage and other features that it was the wrong vehicle. Further, the Mikes maintain it was obvious once the family was out of the car that they were not the suspects. The Mikes also point out that one of the officers—likely

Sergeant Jackson—stated on camera "that ain't them," yet the family continued to be detained.

For purposes of deciding whether an unlawful seizure occurred, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Courts have not established a "bright line" rule for a time limit on a *Terry* stop. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). At some point, an investigative stop becomes a "*de facto*" arrest. *Id.* That is, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Id.* Courts examine "whether the officers detained the [plaintiffs] longer than necessary to confirm or dispel their suspicions." *United States v. Soto-Cervantes*, 138 F.3d 1319, 1323 (10th Cir. 1998).

For example, in *Soto-Cervantes*, the court found that a twenty-minute *Terry* stop was reasonable because police diligently pursued their investigation for drug activity and there was no evidence that police took more time than necessary. *Id.* (citation omitted). In *United States v. Martin*, the court found reasonable an hour delay to obtain a dog sniff where there was abundant suspicion of drug activity and diligence to expedite the dog sniff. 86 F. App'x 364, 366 (10th Cir. 2003) (unpublished) (citations omitted). In *Flowers*, the First Circuit found that a fifteen minute *Terry* detention during a felony stop was reasonable where officers were not dilatory in their investigation and promptly removed the plaintiff's handcuffs upon completion of their search for weapons. 359 F.3d at 31. Similarly, in *Williams*, cited by County Defendants, the court found a five-to-ten minute felony stop to be reasonable, although it did not elaborate. 2012 WL 983788, at *6.

In contrast, in *United States v. Shareef*, the court found that it was reasonable to hold suspects in handcuffs until receiving confirmation whether one of the individuals was a wanted felon.  100 F.3d 1491, 1507 (10th Cir. 1996).  Although the officers learned that the wanted felon was not within the group, one individual was driving with a suspended license, and police arrested this individual.  *Id.*  His companions remained in handcuffs after police arrested the driver with a suspended license.  *Id.*  The court found "there was no reasonable basis for keeping [the others] in handcuffs [after the driver's arrest].  Therefore, we must conclude that at that point their detention became an unlawful arrest."  *Id.* at 1508 (citation omitted).

With respect to the Mikes' false arrest claim based on length of detention, the Tenth Circuit looks to the common law as a starting point to define false arrest for purposes of Section 1983.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1287-89 (10th Cir. 2004).  Nonetheless, the Tenth Circuit has "considered the state law formulation" for false arrest.  *McCormick v. Farrar*, 147 F. App'x 716, 721 (10th Cir. 2005) (unpublished) (citations omitted).  In New Mexico, "[f]alse arrest or unlawful detention occurs when the facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate."  *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006) (internal quotation omitted).  "A defendant possessed of a good faith and reasonable belief in the lawfulness of the action is not liable for . . . false arrest."  *Id.* (citations omitted).  "[A] good faith belief in the lawfulness of the action ordinarily requires probable cause to arrest."  *Id.* (citation omitted).  Yet, "the ultimate question is always whether the plaintiff has alleged a constitutional violation."  *Pierce*, 359 F.3d at 1289.

Based on the timeline discussed in the Factual & Procedural Background, one can calculate that the officers took over two minutes from the time one of the officers stated, "That

ain't them" to the time an officer began helping William Mike out of a patrol car.  Another thirty

seconds passed before an officer finally opened the door to the patrol car containing the two

female grandchildren, and over thirty more seconds passed before the children were allowed to

exit the vehicle.  The Court finds that a reasonable jury could determine that the facts available to

Defendants "would [not] warrant [a] person of reasonable caution to believe detention

appropriate," after dispelling the belief that the Mikes committed any crime, violating clearly

established Tenth Circuit law.  *Fuerschbach*, 439 F.3d at 1207.  Specifically, a reasonable jury

could find that Defendants were being dilatory and not diligently pursuing an investigation

during the minutes that followed the announcement, "That ain't them."

    The Court notes the knowledge of one officer cannot be automatically imputed to

another.  Yet it is not clear from the video evidence here which officers were gathered around the

officer—perhaps Sergeant Jackson—when he stated, "That ain't them."  A jury might determine

that the delay in releasing the Mikes constituted unlawful seizure/false arrest, but there remains

genuine issues of material fact regarding when and which, if not all, of the officers became aware

that the Mike family and vehicle were not the suspects.  Therefore, the Court declines to grant

qualified immunity to Defendants for unlawful seizure/false arrest deriving from the length of

the detention and denies summary judgment on this claim as to all Defendants.

    *c. Excessive Force*

    The Mikes' contend that the drawing of weapons, handcuffing William Mike and his

thirteen-year-old granddaughter, and having William Mike walk backwards and kneel on cold,

wet pavement form the basis for their Fourth Amendment excessive force claim.  County

Defendants argue, however, that these actions did not constitute excessive force as a matter of

law in an investigatory stop.  They contend that the actions in this case were justified for officer

safety, especially because the vehicle had tinted windows and the officers were unable to see who or how many people were inside the vehicle who might pose a threat.  Finally, County Defendants assert that the video evidence shows that the force they used was not excessive.

City Defendants argue that police officers are entitled to take reasonable steps to protect themselves when faced with the possibility of danger.  They cite *Lord v. Hall*, maintaining that the case, in which officers were entitled to qualified immunity for alleged excessive force, is similar to the present case and provides persuasive precedent for according qualified immunity to Defendants.  520 F. App'x 687 (10th Cir. 2013) (unpublished).

The eleven-year-old granddaughter can be heard on video sobbing and crying while alone in the back of Officer Nickerson's patrol car.  (Doc. 31 Video Exhibit 4 at 09:26:05).  In addition, the Mikes argue that the handcuffing of an elderly adult and a child was unreasonable. The Mikes contend that officers are permitted to use only as much force as necessary to secure their safety and maintain the status quo and it was clear when William Mike stepped out of the vehicle that the family posed no danger to the police.  Moreover, they contend the officers not engaged in the aggressive conduct had a duty to protect the Mike family from the excessive force by other officers.

"Excessive force claims are governed by the Fourth Amendment's objective reasonableness standard."  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (quotation omitted).  "Under this standard, 'the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Whether the actions are objectively reasonable turns on "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3)

whether he is actively resisting arrest or attempting to flee." *Lord v. Hall*, 520 F. App'x at 692

(citing *Graham*, 490 U.S. at 396) (granting qualified immunity to police when plaintiff was

injured while resisting arrest while officers were investigating aggravated robbery, plaintiff was

verbally and physically uncooperative, and plaintiff tried to reenter truck).  Where one officer

acts with excessive force, "it is clearly established that all law enforcement officials have an

affirmative duty to intervene to protect the constitutional rights of citizens from infringement by

other law enforcement officers in their presence."  *Hall v. Burke*, 12 F. App'x 856, 861 (10th Cir.

2001) (unpublished); *see also Tanner v. San Juan Cty. Sherriff's Office*, 864 F. Supp. 2d 1090,

1133 (D.N.M. 2012) ("[T]he Court concludes that it should take into account an information

imbalance between officers in evaluating whether a secondary officer had a duty to intervene in

another officer's conduct.").

 Excessive force claims "are generally fact questions for the jury."  *Buck v. City of

Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008) (citing *Quezada v. Cty. of Bernalillo*, 944

F.2d 710, 715 (10th Cir. 1991) ("[W]hether the police used excessive force in a § 1983 case has

always been seen as a factual inquiry best answered by the fact finder.") (collecting cases),

*overruled on other grounds by Saucier v. Katz*, 553 U.S. 194 (2001)).  That is, a jury typically

decides a "mixed factual-legal inquiry . . . whether the force used was reasonable."  *Cavanaugh

v. Woods Cross City*, 718 F.3d 1244, 1254 (10th Cir. 2013) (citation omitted).  Where an officer

asserts a qualified immunity defense, the court addresses "the legal inquiry whether the officer's

actions were objectively reasonable in light of clearly established law."  *Id.* (citation omitted).

 The use of guns or handcuffs or placing a suspect on the ground during an investigative

detention does not *per se* make a stop unreasonable.  *United States v. Neff*, 300 F.3d 1217, 1220

(10th Cir. 2002)).  "Since police officers should not be required to take unnecessary risks in

performing their duties, they are authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [*a Terry*] stop." *Id.* "Nevertheless, unlike when there is probable cause for an arrest, there must be justification for their use, such as specific reason to fear violence or escape." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1323 (10th Cir. 2002).

The Court finds that the show of guns at the commencement of the felony stop was objectively reasonable. At the time of the stop, which this Court found was reasonable, Defendants did not know who was inside the vehicle. The suspect had perpetrated a spree of violent crime throughout the morning hours, including robbery and burglary, stole three vehicles, drove through fences, and sped recklessly through the city. Based on these circumstances, the officers took objectively reasonable steps to protect their safety, and no reasonable jury could find that these steps constituted excessive force.

Likewise, no reasonable jury could find that Deputy Begay's act of handcuffing William Mike violated a constitutional right, given clearly established law from the United States Supreme Court. *Graham*, 490 U.S. at 396. The suspect in this case committed several felonies throughout his crime spree and placed citizens in danger. "[An officer] could reasonably conclude that the driver posed an immediate threat to the safety of the officers and the public—a driver caught with a stolen vehicle has strong incentive to evade arrest, given the seriousness of the crime." *Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (finding no excessive force where officer pointed weapon at plaintiff). It is not clear from the review before the Court whether the suspect reportedly was armed. Nevertheless, the suspect's actions throughout the morning strongly indicated he was a threat to the safety of the officers and others. William Mike was also the first person out of the vehicle with darkly tinted windows and, therefore, could have

been the lone suspect Defendants were seeking. Despite the Mikes' argument that William Mike bore no resemblance to the suspect, the parties have provided no evidence, such as dispatch records, with a description of the suspect. The video evidence does not show William Mike resisted arrest or attempted to flee from Defendants once out of the vehicle. But only moments before, Deputy McCoy observed the vehicle and the driver inside fail to comply with his demand to stop.

In contrast, a reasonable jury could find facts supporting excessive force against the thirteen-year-old granddaughter, Au.M., based on Deputy Begay handcuffing her. The child exited the vehicle from the back seat. She had not been driving the vehicle and was in fact too young to drive. She readily complied with Defendants' instructions, did not resist or attempt to flee. There was no indication that the child posed a threat to the safety of the officers or others. A reasonable jury could, therefore, find that there was no justification for Deputy Begay's use of handcuffs on the granddaughter.

Based on these findings, Defendants are entitled to qualified immunity as to the force applied to William Mike and for pointing guns at the vehicle at the beginning of the stop. However, Deputy Begay is not entitled to qualified immunity for handcuffing the thirteen-year-old granddaughter, Au.M. Nor are the remaining Defendants entitled to qualified immunity for handcuffing her because it is unclear which officers were at the scene when she was handcuffed such that they might have intervened.

### d. Unlawful Search

City Defendants argue that the Mikes' claim for an unlawful search fails as a factual matter, as no search occurred, and they are entitled to qualified immunity. The Mikes respond that video evidence shows City Defendants searching the Mike vehicle passenger compartment

and trunk.  (Doc. 55 Begay Video Ex. 3 at 9:27:08).[16]  County Defendants do not make any

arguments regarding an unlawful search in their Motion for Summary Judgment.[17]

     The video evidence shows officers McCoy, King, and Nickerson walking over to the

Mike vehicle at 9:27:10 a.m.  One of the officers stood by the left side of the car and bent over to

look inside without placing his head in the interior of the car.  (*Id.* at 9:27:15).  Another officer

walked around to the back of the vehicle at 9:27:22 a.m., disappeared from view, and reappeared

on the other side of the vehicle at 9:27:28 a.m.  The Mikes contend that a reasonable jury could

find from the video that the officer released the trunk latch and then briefly searched the trunk.

The officers stood around the car for a total of approximately fifty seconds.  (*Id.*)  At 9:27:45

a.m., one of the officers walked away from the Mike vehicle.  A different officer looked through

the open doors on the left side of the vehicle.  (*Id.* at 9:27:48 a.m.).  The remaining two officers

walked away from the car at 9:28:02 a.m.  All of these acts occurred within one minute.

     In *United States v. Corral*, the Tenth Circuit found that the plain view exception to the

search warrant requirement applied when an officer, while standing outside, simply looked into

the vehicle through its open door and saw a package of cocaine.  970 F.3d 719, 723-24 (10th Cir.

1992).  The officers here did not search the vehicle but only inspected the passenger

compartment by peering in through the open doors of the car.  As a result, no reasonable jury

could find the search was unlawful.  Similarly, there is no video evidence that the trunk was

opened and searched.  The officer who went to the rear of the car disappeared from view for only

---

[16] The time stamps on this video appeared to be an hour behind.  The Court has adjusted the times accordingly.

[17] A Court may grant summary judgment *sua sponte* if "the losing party was on notice that she had to come forward with all of her evidence."  *Ward v. Utah*, 398 F.3d 1239, 1245 (10th Cir. 2005) (quotation omitted).  In this case, the Mikes were on notice that they had to come forward with all of their evidence regarding the alleged search based on City Defendants' Motion for Summary Judgment.  (Doc. 38).

six seconds, the Court finds that no reasonable jury could conclude that the officer searched the trunk of the car.  While County Defendants failed to make a qualified immunity argument against the Mikes' allegation of an unlawful search, the Court's conclusion that no Fourth Amendment violation occurred from a plain view inspection of the vehicle applies equally to officers McCoy, King and Nickerson shown on video.  Therefore, the Court grants summary judgment in favor of Defendants as to the unlawful search claim and will dismiss the claim with prejudice.

### 4. State Claims

#### a. False Arrest/Unlawful Detention

As discussed previously, the Tenth Circuit considers the New Mexico definition of false arrest for purposes of a Section 1983 false arrest claim.  The analysis already made with regard to the length of detention for the Section 1983 claim applies to the state claim as well: that is, a reasonable jury could determine that the facts available to Defendants "would [not] warrant [a] person of reasonable caution to believe detention appropriate."  *Fuerschbach*, 439 F.3d at 1207 (stating the standard for false arrest or unlawful detention under New Mexico law).  Therefore, the Court denies summary judgment to Defendants as to the Mikes' state false arrest/detention claim.

#### b. Excessive Force

State "excessive force claims brought against police officers are to be analyzed under the 'objective reasonableness' standard of the Fourth Amendment."  *State v. Mantelli*, 2002-NMCA-033, ¶ 22, 42 P.3d 272, 277.  As discussed earlier, no reasonable jury could find facts supporting excessive force in the use of guns or in handcuffing William Mike, but a reasonable jury could find that handcuffing the thirteen-year-old granddaughter, Au.M., constituted excessive force.

### c. Assault and Battery

County Defendants seek summary judgment on the Mikes' assault and battery claims on the basis that the drawing of weapons and use of handcuffs were lawful under the circumstances. The Mikes counter that the relevant events satisfy the elements of both assault and battery.  City Defendants point out that they did not handcuff any of the Mikes, and they argue that drawing their weapons was justified to protect their personal safety.

An assault includes "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery."  NMSA 1978, § 30-3-1 (Repl. Pamp. 2004).  "Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner."  NMSA 1978, § 30-3-4 (Repl. Pamp. 2004).

"An officer can be held liable for assault and battery if he uses excessive force."  *Peña v. Greffet*, 108 F. Supp. 3d 1030, 1048 (D.N.M. 2015) (quotation omitted).[18]  The Court previously found that Defendants' act of pointing weapons at the Mike vehicle and handcuffing William Mike were not unlawful under the circumstances, so the Mikes' assault claim based on those actions fails.  However, a reasonable jury could find that Deputy Begay's handcuffing of the thirteen-year-old granddaughter, Au.M., was unlawful.  The assault and battery claim thus survives against Deputy Begay as to handcuffing the child.  All other Defendants are entitled to summary judgment on these claims.

### d. Unlawful Search

The Court previously found no violation of the Fourth Amendment through Defendants' plain view observation of the Mike vehicle passenger compartment. No further analysis is

---

[18] Immunity is waived under the New Mexico Tort Claims Act for assaults or batteries committed by law enforcement officers.  NMSA 1978, § 41-4-12 (Repl. Pamp. 1996).

required in granting summary judgment to Defendants on this claim.

IT IS ORDERED that

1) County Defendants' Motion for Summary Judgment (Doc. 29) and City Defendants' Motion for Summary Judgment (Doc. 38) are both granted in part and denied in part;

2) all Defendants[19] are entitled to qualified immunity on the Section 1983 unlawful search claim, the Section 1983 unlawful seizure claim to the extent the claim deals with the initial stop, and the Section 1983 excessive force claim to the extent the claim deals with pointing weapons at the Mikes and handcuffing William Mike; the Court grants summary judgment to Defendants as to these claims; and the claims will be dismissed with prejudice;

3) all Defendants are not entitled to qualified immunity against the Section 1983 unlawful seizure/false arrest claims to the extent the claims deal with the length of detention and the Section 1983 excessive force claim to the extent the claim deals with the handcuffing of thirteen-year-old Au.M., and the Court denies summary judgment on these claims;

4) the Court grants summary judgment as to all Defendants on the Mikes' state unlawful search claim, the state false arrest/unlawful detention claims to the extent the claims deal with the initial stop, and the state excessive force and assault and battery claims to the extent the claims deal with pointing weapons at the Mikes and handcuffing William Mike; and the claims will be dismissed with prejudice;

5) the Court denies summary judgment as to all Defendants on the Mikes' state false arrest/unlawful detention claims to the extent the claims deal with the length of detention

---

[19] As previously noted (*see* FN 1), the term "Defendants" as used by this Court does not include Faulk or Ortega-Gallegos.

and state excessive force and assault and battery claims to the extent the claims deal with the handcuffing of thirteen-year-old Au.M.; and

6) all claims by Shannon Mike and Georgette Mike, individually, will be dismissed without prejudice for lack of standing, and Shannon Mike and Georgette Mike, individually, will be terminated as Plaintiffs to this action.

_____
UNITED STATES DISTRICT JUDGE